HARRY E. KARR *v.* MADELINE BOYER ROBINSON ET AL.

[No. 38, April Term, 1934.]

*Decided July 6th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*Edward G. Colgan, Jr.,* and *Philemon B. Coulter,* for the appellant.

*Ernest Volkart,* with whom were *Michael Fahey* and *Robinson & Fahey* on the brief, for the appellees.

PATTISON, J., delivered the opinion.

Alphonso P. Robinson was first married to one Sue Ashby Robinson, who died on the 5th day of April, 1921, leaving, surviving her, her husband, and two daughters by her marriage with him; Mary Elizabeth Robinson, born February 17th, 1917, and Katherine Seymour Robinson, born December 19th, 1919.

On October 29th, 1927, Alphonso P. Robinson was again married, this time to Madeline P. Boyer. Two years thereafter, on the 20th day of November, 1929, he executed his last will and testament, by which he devised and bequeathed all his property, real, personal, and mixed, to the Safe Deposit & Trust Company of Baltimore, and Harry E. Karr, in trust; one-third for the benefit of his wife, and one-third for the benefit of each of his said two daughters, for and during their respective lives, but, upon failure of the daughters to exercise the power of appointment therein conferred upon them, and, in the event of both of them dying intestate without descendants surviving them, the trust fund so created for their benefit was to pass to the testator's nephew and niece for their lives and the life of the survivor of them, with ultimate remainder over to their heirs at law. And, by the will, Harry E. Karr, the appellant, was appointed executor and also guardian of the said two daughters of the testator.

On May 8th, 1932, about five years after the marriage of Alphonso to his second wife, Madeline B. Robinson, and nearly three years after the execution of his last will and testament, a daughter (Sarah Riley) was born as a result of his second marriage, and, as shown by an agreed statement of facts found in the record, filed February 20th, 1934, another child was then expected to be born in the next few months.

On the 31st day of December, 1933, seven months after the birth of the child Sarah R. Robinson, Alphonso P.

Robinson died, but, before dying, he, on the 19th day of July, 1933, two months after the birth of the child, wrote Harry E. Karr, draftsman of his will, saying:

"Regarding my Will, in view of my having another heir, it should be changed somewhat. The name of that lady is 'Sarah Riley.'

"I also wish to eliminate that part of my will in which I make my sister's children beneficiaries. Instead, I wish the trusteeship dissolved and the money turned over to each of my children at the age of thirty-five. I, however, wish to continue the trusteeship for my wife."

After the death of Alphonso P. Robinson, the paper writing purporting to be his will was presented to the Orphans' Court of Harford County for probate. A caveat was filed thereto by the widow, Mrs. Robinson, alleging that the said paper writing was not Alphonso P. Robinson's last will and testament, but that he died intestate, for the following reasons:

"That since the execution of said alleged Will there has been a total change in the situation of the family of the said Alphonso P. Robinson by the birth of the said infant, Sarah R. Robinson, to wit: on the eighth day of May, 1932, and a strong probability that another child will be born to your petitioner, and that no provision was made in said paper writing for the said Sarah R. Robinson, or for the unborn child, and your petitioners, therefore, allege that by said change in the status of the family, impliedly and by operation of law, the said paper writing purporting to be the Last Will and Testament of the said Alphonso P. Robinson should be revoked."

The Orphans' Court refused to probate the alleged paper writing, and the widow, Mrs. Robinson, filed her renunciation of the right to administer upon the estate, and Harry E. Karr and John A. Robinson were appointed administrators. The appeal in this case is from the order of the Orphans' Court refusing to admit the said alleged will to probate.

It is upon the above state of facts that we are to deter-

mine whether the will of Alphonso P. Robinson has been revoked.

As was said by Judge Stone, speaking for the court, in *Baldwin v. Spriggs*, 65 Md. 373, 5 A. 295:

"It would be a profitless task to review all the English cases on this subject. They may be found by the curious fully discussed by Chancellor Kent with his usual ability in the case of *Brush v. Wilkins*, 4 John. Ch. [N. Y.] 596. It is enough for us to say that, after a good deal of doubt and hesitation, it was finally settled in England, before our Revolution, that marriage and issue taken together did amount to an implied revocation of a will previously made, and that such implied revocations were not within the statute of frauds, but that such implied revocations might be rebutted and controlled by circumstances.

"The final determination of the matter seems to have been reached by the cases of *Christopher v. Christopher*, 2 Dickens 445, decided in 1771 by the Court of Exchequer, Parker, C. B., presiding, and in the case of *Spraage v. Stone* (decided in 1773), Amb. 721.

"These cases appear to have definitely settled the law that a subsequent marriage and birth of a child, standing alone, and unaccompanied by other circumstances, amount to an implied revocation of a will.

"The whole subject, says Chancellor Kent, has continued to receive great discussion in the English courts since the era of our Revolution, growing out of new cases constantly arising amidst the endless variety of human affairs.

"The most important of the English cases since the Revolution is the case of *Marston v. Roe*, 8 Ad. & E. 14, decided in 1838 by fourteen out of the fifteen English judges, where the general doctrine we have stated was reaffirmed."

Not only was this doctrine finally established in England, but it is now the settled law of this state. *Sedwick v. Sedwick*, an unreported case decided in June Term, 1884, and *Baldwin v. Spriggs, supra.*

The facts of the case before us, however, differ some-

what from the cases above referred to. In those cases there were both marriage and a birth of a child following the execution of the will, while in this case the will is followed only by the birth of a child, the marriage having occurred prior to the execution of the will. Therefore the only question we are to determine is whether the subsequent birth of a child alone, without a subsequent marriage, was sufficient to revoke the will; and, in determining this question, we must decide whether the lack or absence of a subsequent marriage is to be given the force and effect of abrogating the rule or doctrine stated. To determine this latter question, it would seem necessary to ascertain the grounds upon which that doctrine or rule is based, also the effect thereon of the later statutes relating to the rights of married women, including their rights to the property of their deceased husband by inheritance or otherwise.

The assignment of grounds upon which the doctrine of implied revocation rested was also a source of difficulty with the English courts. Lord Mansfield, in *Brady v. Cubitt,* 1 Doug. 31, thought the doctrine "should rest on the presumption that the testator intended to revoke his will and, that it therefore followed, that such presumption might be rebutted" even by parol evidence of a contrary intention. The courts were not altogether satisfied with the views expressed by Lord Mansfield, as they feared the effect of the statement therein as to the character of evidence that could be used in rebuttal of the presumption there stated, and in 1792 Lord Kenyon in *Doe v. Lancashire,* 5 Term R. 49, placed the rule upon another ground; namely, "a tacit condition annexed to the will when made, that it should not take effect if there should be a total change in the situation of the testator's family." This view of Lord Kenyon was afterward adopted by Lord Ellenborough, in *Kenebel v. Scrafton,* 2 East, 534, decided in 1802, and reaffirmed in *Marston v. Roe, supra,* decided in 1838, and also adopted by this court in *Baldwin v. Spriggs, supra.*

As stated by Lord Mansfield, if there were marriage

and birth of a child subsequent to the execution of the will, then a presumption existed that the testator intended to revoke his will, while the views of Lord Kenyon, afterwards generally adopted by the courts, were to the effect that, if there were a marriage and birth of a child after the execution of the will, followed by a total change in the situation of the testator's family, there was, in such case, a tacit condition attached to the will when made that it should not take effect.

The important factor in determining whether the rule stated by Lord Kenyon applies is the "change in the situation of the testator's family" occurring between the execution of the will and his death, by reason of which, if the will is permitted to stand, injustice will result to those mentioned in the rule and for whom no provision is made in the will.

The status of the widow differs greatly from that of the child born subsequent to the will. In her case, she is not dependent upon the will of the husband for what she may receive from his estate. At the time of the formation of the rule, she was entitled to her dower interest therein, and of this she could not be deprived. Since that time her rights have been greatly enlarged and extended, until now she may take as heir of her husband. It was also within her power at the time of her marriage to contract with her husband for a payment to her of an additional amount. The child, born subsequent to the execution of the will, and for whom no provision is made therein, is not in the position to contract with his parent, nor does the law make any provision for him in that situation, by which he shall receive any part of his parent's estate. He is entirely dependent upon the parent's will, as to what he shall receive of the latter's estate; and, should he receive nothing, he is deprived of the moral obligation due him from the parent to provide for him upon the parent's death.

To hold, under the circumstances, that the wrong done to the subsequently born child cannot be righted unless it be shown that the marriage of the parents was subse-

quent to the will, a fact of little or no import as affecting the rights of the wife or mother, would, we think, be placing an illogical and unreasonable construction upon the rule.

In the Ecclesiastical Court of England, *Johnson v. Johnson*, 1 Phillim, 150, decided after the statement of the rule by Lord Kenyon, and where the question was presented whether concurrence of a subsequent marriage and the birth of a child or children after the execution of the will was essential to a compliance with the rule, the court said: "The question remains to be considered whether both circumstances are required to concur; whether the rule has been so limited, as that subsequent marriage is an essential requisite. Now I cannot help thinking that upon plain reason, and upon substantial justice, it should seem that the concurrence of marriage is not an essential part. The birth of children, after making a will by a married man, may have imposed as strong a moral duty upon him, forming the ground work of presumed intention, and may be accompanied by circumstances furnishing as indisputable proof of real intention, as if the will had been made previous to the marriage. * * * The law * * * makes a provision for the wife by dower. If she enters into the contract, (of marriage) and takes no precaution of this sort, she takes her chance either of the husband providing for her, or of providing for herself. But after-born issue are parties to no contract; they come into the world entirely dependent upon the parent; and if it is the legal duty of a father while living to maintain his children, so it is a strong moral obligation upon him not to exclude them from a provision after his death. It is true he has a right to do it; though at one time, * * * he had not the right of excluding them—the law did not allow him to dispose of his whole property; at present he may if he pleases, and the law can afford no relief; but by moral obligation there is a strong foundation laid for presuming that he did not intend to exclude them. In point then of true reason and sound sense the concurrence of subsequent marriage is not essential in all cases."

As we have already stated, the facts of marriage, sub-sequent to the execution of a will, and the subsequent birth of a child, are now generally held to be sufficient to revoke a will by implication, subject to certain exceptions to the rule. The authorities, however, are not in accord upon the question whether or not the concurrence of such facts is essential to an implied revocation of the will. Some have held concurrence not essential, while others have taken a contrary view. In most of the states, statutes have been passed relative thereto. In this state no such statute had been passed, nor has there been any case before this court where this question has been raised upon facts similar to those in this case, though it is contended by the appellant that *Massey's Lessee v. Massey,* 4 H. & J. 141, fully decides the question. There, Massey executed his will while married and before the birth of a child. In his will he provided that should his wife be pregnant at his death, and have issue by him, he devised to such issue, and to the heirs of such issue, all the lands he had given to his wife (by the will) during her life, at her death. He also bequeathed to such issue a legacy; and in the case his wife should have no issue by him, he otherwise disposed of the property so devised to her for life. Upon the death of the testator, the will was filed for probate and a caveat was also filed to the will. The caveat was heard by the orphans' court and probate of the will was refused. On the court's refusal to probate the will, an appeal was taken to the court of chancery, and the order of the orphans' court was affirmed. Some years thereafter, in an ejectment suit, the title to the property involved was raised because of the alleged wrongful decision theretofore made. The trial court, in this latter case, decided that the orphans' court and chancellor were wrong in holding that the will should not have been probated, and this court affirmed his decision. There was no opinion filed in the case. The court gave no reasons for reaching its conclusion, and consequently we do not know upon what ground it decided the case, but it will be seen from the examination of the will that the

conclusion it reached was right. The testator, as shown by the will, had in mind the possibility of after-born children and made provision for them. When this was done, it became an exception to the rule, and for that reason alone, if for no other, the will was not revoked. This exception to the rule was recognized in *Baldwin v. Spriggs, supra,* for in it it is said that the will is not revoked after "the testator makes provision for the children of the subsequent marriage." The chief question in that case was whether the language used in the will could be construed and held to be a provision for the after-born children, and the court decided in the negative. There is only a meager statement of the facts found in the *Massey* case, and it is not shown how and upon what facts the case arose. The court, so far as we are able to ascertain, has never passed upon the question here involved, and hence we are at liberty to follow either line of decisions, and, as those cases holding that the concurrence of the facts named are not essential appear to us to be most logical, we will hold that the will, in this case, was impliedly revoked.

*Order affirmed, with costs.*